1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ORLANDO DELATORRE,

11            Petitioner,                    2: 09 - cv - 1974 - TJB

12       vs.

13   BRIAN HAWS,

14            Respondent.                         <u>ORDER</u>

15   _____/

16        Petitioner, Orlando DeLaTorre, is a state prisoner proceeding with a *pro se* petition for

17   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner, barely fourteen years old at the

18   time of the underlying offense, is currently serving a maximum sentence of fifty years to life plus

19   three additional consecutive indeterminate life sentences in prison after a jury convicted him on

20   one count of first degree murder, three counts of attempted murder, and other related offenses.

21   Petitioner raises five claims in this federal habeas petition; specifically: (1) he did not receive an

22   adequate *Miranda* admonishment and did not waive his *Miranda* rights before making statements

23   to the police which were used against him a trial ("Claim I"); (2) his statements to the police

24   were involuntary and a result of coercion ("Claim II"); (3) there was insufficient evidence for the

25   jury to find Petitioner guilty of first degree murder and premeditated attempted murder ("Claim

26   III"); (4) the jury instructions removed a valid defense and removed consideration of an element

1

1 of the crime, impermissibly lowering the prosecution's burden of proof ("Claim IV"); and, (5)

2 the imposed sentence is cruel and unusual ("Claim V").  Both Petitioner and Respondent

3 consented to the jurisdiction of a United States Magistrate Judge in this case.  Docket No. 4, 14.

4 For the reasons stated herein, the federal habeas petition is denied.

5 I.  FACTUAL BACKGROUND[1]

6 The facts of this case are all too common. A gang member
"disrespects" a rival gang member, threats are made, a weapon is
7 retrieved, and someone is needlessly killed over mere words. As a
consequence of misguided bravado, defendant Orlando
8 Delatorre–who was 14 years old when the killing occurred but was
tried as an adult–will likely spend the rest of his life in prison for
9 aiding and abetting the murder of Adrian Cortez. . . .

10 Some of the victims and codefendants have the same last name. To
avoid confusion, we will initially refer to them by their first and
11 last names and thereafter use their first names only.

12 In October 2004, defendant lived across the street from Vanessa
Ramirez. Vanessa and defendant were both Sureno gang members.
13 Vanessa's cousin, Adrian Cortez, was a member of the rival
Norteno gang.
14
On the night of October 2, 2004, Adrian spoke with Vanessa on the
15 sidewalk by her residence. Adrian was accompanied by Albert
Blanco, Isael Teran, and Gustavo Teran. Adrian and Gustavo were
16 Nortenos, and Albert and Isael associated with the gang.

17 According to Vanessa, Adrian's companions said disrespectful
things to her. Defendant heard the exchange, came out of his
18 apartment onto the balcony, and exchanged insults with his gang
rivals. They used words like "scrap," which is disrespectful of
19 Surenos. Defendant called them "buster," which is disrespectful of
Nortenos. Defendant challenged them to fight and threatened to kill
20 Isael. Adrian, Gustavo, Albert, and Isael began to leave but
continued arguing with defendant as they walked to Adrian's
21 apartment nearby.

22 Defendant went back inside his apartment, telephoned David
Villanueva, and asked him to come over with his gun. Defendant
23 came back outside carrying a machete, walked down to his

24

25 [1]       The factual background is taken from the California Court of Appeal, Third
Appellate District decision on direct appeal from March 2008 and filed in this Court by
26 Respondent on May 12, 2010 as Exhibit 1 to his first amended answer (hereinafter referred to as
the "Slip Op.").

driveway, and told her his "homies" were coming with a gun and it would not be his fault if her cousin got "blasted."

Adrian returned with his friends, and the argument continued. David and Larry Villanueva arrived in a car with at least one other male, and they joined the fray. According to Vanessa, it looked as though there might be a fight. David had a rifle, and Larry had two bottles in his hands. Adrian's group picked up some rocks. Defendant told David to shoot or "kill 'em," and David fired some shots, two of which hit 16-year-old Adrian in the chest and killed him. David fired more shots as he moved toward Albert, Isael, and Gustavo, who were fleeing. Defendant and the Villanuevas then drove away in their car.

Two days later, on October 4, 2004, two undercover detectives investigating the murder saw a car matching the description of the one involved in the shooting. Larry, defendant, and two other males were in the car. The detectives followed the car to Larry's residence, where Larry went inside and returned with something in a blanket and placed it in the trunk. When the four men drove off, uniformed officers stopped the car. A loaded .357 caliber handgun and sawed-off shotgun were wrapped in a blanket in the trunk. Defendant was arrested and transported to the Lodi police station.

Detectives Brucia and Kermgard interviewed defendant after his arrest. Defendant told them he knew the concealed weapons were in the car when he was arrested. He admitted that he was a Sureno and that David and Larry were his gang friends. On the night of the shooting, defendant knew that David was going to shoot Adrian, who was a Norteno. Adrian and his Norteno friends had been disrespecting defendant's sister, so he called David and asked him to bring his gun. Defendant admitted that he told David to "kill 'em" or "shoot 'em," meaning Adrian and the other Nortenos. According to defendant, he wanted David to shoot any Norteno.

Detective Brucia testified as a gang expert and explained that the crimes were committed during a classic clash between members of rival gangs and that defendant committed the crimes on behalf of the Sureno gang. Detective Brucia was not aware of any other felonious activities by defendant, who was 14 years old when the crimes were committed.

*Defense*

Defendant testified he had been a Sureno for about a year at the time of the shooting. On the night of October 2, 2004, he heard arguing outside where his sisters were playing. Thinking they might be in trouble, he went outside and saw Adrian and his friends shouting insults. Defendant shouted back then went inside, called David, and asked him to bring his gun. Defendant asserted he did not want to shoot or kill anyone; he just wanted to scare off

1
2
3
4
5

Adrian and his companions. When defendant went back outside, Adrian and his crew challenged him to a fight. Vanessa persuaded Adrian to leave with his friends, but they returned. Defendant, who claimed he did not own a machete, picked up a stick, and Vanessa pulled out a knife. David arrived with a rifle. When Adrian and his friends picked up rocks, defendant told David to "shoot 'em." Adrian had a rock the size of defendant's head, and defendant was afraid of being hit. Defendant ran to the car when he heard the shots.

6
7
8

Defendant admitted he knew there were guns in the car when he was arrested two days later. He stated, however, he did not learn about the guns until the officers stopped the car, at which point Larry told him there were guns in the trunk.

9

## II.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

10        An application for writ of habeas corpus by a person in custody under judgment of a state

11   court can only be granted for violations of the Constitution or laws of the United States.  *See* 28

12   U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

13   *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

14   Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

15   and Effective Death Penalty Act of 1996 ("AEDPA") applies.  *See Lindh v. Murphy*, 521 U.S.

16   320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

17   decided on the merits in the state court proceedings unless the state court's adjudication of the

18   claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

19   clearly established federal law, as determined by the Supreme Court of the United States; or (2)

20   resulted in a decision that was based on an unreasonable determination of the facts in light of the

21   evidence presented in state court.  *See* 28 U.S.C. 2254(d); *Perry v. Johnson*, 532 U.S. 782, 792-

22   93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000).

23        In applying AEDPA's standards, the federal court must "identify the state court decision

24   that is appropriate for our review."  *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).

25   "The relevant state court determination for purposes of AEDPA review is the last reasoned state

26   court decision."  *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citations omitted).

1    "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained

2    orders upholding that judgment or rejecting same claim rest upon the same ground." *Ylst v.*

3    *Nunnemaker*, 501 U.S. 797, 803 (1991).  To the extent no such reasoned opinion exists, courts

4    must conduct an independent review of the record to determine whether the state court clearly

5    erred in its application of controlling federal law, and whether the state court's decision was

6    objectively unreasonable.  *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  "The

7    question under AEDPA is not whether a federal court believes the state court's determination

8    was incorrect but whether that determination was unreasonable—a substantially higher

9    threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

10   "When it is clear, however, that the state court has not decided an issue, we review that question

11   *de novo*." *Reynoso v.Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (citing *Rompilla v. Beard*,

12   545 U.S. 374, 377 (2005).

13                    III.  ANALYSIS OF PETITIONER'S CLAIMS

14        1.  Claim I

15        In Claim I, Petitioner argues that his statements to police should not have been admitted

16   at trial because he did not receive a valid *Miranda* admonishment and he did not make a knowing

17   and intelligent waiver of his rights under *Miranda*.  Specifically, Petitioner finds fault with the

18   interrogating detective's admonition that anything Petitioner said "may" be used against him in

19   court, rather than "would" be used against him, that the admonition only informed Petitioner of

20   his right to "the presence of an attorney before and during" interrogation and not of his right to

21   consult with that attorney, and that he was not informed that the real reason he was being

22   interrogated was in relation to a murder investigation.  Petitioner also contends that the

23   prosecution failed to meet their high burden of proving that Petitioner had validly waived his

24   rights under *Miranda*.

25   / / /

26   / / /

In ruling on Petitioner's claim on direct appeal, the California Court of Appeal stated as follows:

> Defendant contends that he did not receive adequate *Miranda* warnings (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (hereafter *Miranda*), that he did not waive his *Miranda* rights, and that his incriminating statements to the police were involuntary. Thus, according to defendant, the trial court erred in denying his motion to exclude these statements. Not so.
>
> A *Miranda* waiver must be knowing, intelligent, and voluntary. (*Colorado v. Spring* (1987) 479 U.S. 564, 573 [93 L.Ed.2d 954, 965].) There are two distinct dimensions to this requirement: "'First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.'" (*Ibid.*, quoting *Moran v. Burbine* (1986) 475 U.S. 412, 421 [89 L.Ed.2d 410, 421].)
>
> We independently review the totality of the circumstances to determine whether the prosecution has met its burden and proved that the statements were voluntary. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 285-286 [113 L.Ed.2d 302, 315]; *People v. Thompson* (1990) 50 Cal.3d 134, 166, disapproved on other grounds in *Creutz v. Superior Court* (1996) 49 Cal.App.4th 822, 829.) In making this determination, we consider factors such as the length of the interrogation, its location, its continuity, and the defendant's sophistication, education, physical condition, and emotional state. (*People v. Williams* (1997) 16 Cal.4th 635, 660; *In re Shawn D.* (1993) 20 Cal.App.4th 200, 209.) "[A]ny factual findings by the trial court as to the circumstances surrounding an admission or confession, including '"the characteristics of the accused and the details of the interrogation" [citation],' are subject to review under the deferential substantial evidence standard. [Citation.]" (*People v. Williams*, *supra*, at p. 660.)
>
> Here, Detectives Brucia and Kermgard interviewed defendant. They asked a few preliminary questions about his age and grade in school, and then informed him that he had been arrested for carrying a loaded concealed weapon. The detectives explained that they wanted to discuss the matter but first needed to advise him of his rights, as follows: "You have the right to remain silent. Anything you say may be used against you in court. [¶] You have a right to the presence of an attorney before and during any questioning. If you cannot afford an attorney, one will be appointed

6

for you free of charge before any questioning if you want. [¶] Do you understand those rights?"

Defendant nodded that he understood. After a brief pause, one of the detectives asked defendant: "You want to tell me what happened today and kind of how you became involved in that car and getting arrested and stuff today?" Defendant indicated that he did not understand the question but freely answered the questions that followed. A short time later, the detectives began to discuss Adrian's murder. They eventually obtained defendant's statement that he was a gang member who had summoned David, a fellow gang member, to bring a gun to shoot the Nortenos because "they were disrespecting [defendant's] house." He urged David to "kill 'em" because he wanted any Norteno shot.

In defendant's view, the *Miranda* advisement was inadequate because, rather than being advised that his statements can and will be used against him in court, he was told his statements may be used against him; furthermore, he was not told of the right to consult with counsel prior to being questioned, only to the right to the presence of counsel prior to questioning. The contention fails.

*Miranda* warnings "are 'prophylactic' [citation] and need not be presented in any particular formulation or 'talismanic incantation.' [Citation.] The essential inquiry is simply whether the warnings reasonably "'[c]onvey to [a suspect] his rights as required by *Miranda.*'" [Citation.]" (*People v. Wash* (1993) 6 Cal.4th 215, 236-237.)

The advisement that any statements may be used against him reasonably conveyed to defendant that his statements could be used against him. And notification that he had the right to the presence of an attorney free of charge prior to questioning reasonably conveyed that he had the right to consult with an attorney before answering the detectives' questions. Indeed, *Miranda* summarized its holding as follows: "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." (*Miranda*, *supra*, 384 U.S. at p. 444 [16 L.Ed.2d at pp. 706-707], italics added.) Thus, the warnings given to defendant "reasonably conveyed" his essential *Miranda* rights.

The circumstances also support the trial court's finding that defendant waived his *Miranda* rights. "[A]n express waiver [of *Miranda* rights] is not required where a defendant's actions make clear that a waiver is intended." (*People v. Whitson* (1998) 17 Cal.4th 229, 250; *North Carolina v. Butler* (1979) 441 U.S. 369, 373 [60 L.Ed.2d 286, 292] ["waiver can be clearly inferred from the actions and words of the person interrogated"].) A suspect's indication he understood the *Miranda* advisement, and his

subsequent responses to questions, demonstrate a knowing and intelligent agreement to speak with authorities. (*People v. Whitson*, *supra*, at pp. 247-250 [defendant's willingness to speak with the police readily apparent from his responses]; *People v. Medina* (1995) 11 Cal.4th 694, 752 [express statement of waiver not required when defendant was read his rights and thereafter made a statement]; *People v. Sully* (1991) 53 Cal.3d 1195, 1233 [implied waiver found when suspect was advised of his rights, said that he understood them, and then gave a statement].)

Defendant's waiver of his *Miranda* rights can be implied from the fact that, after nodding affirmatively indicating he understood his rights, and after a pause during which there was ample time for him to choose to refuse to speak to the detectives or to choose to request an attorney, defendant answered the detectives' questions.

Defendant argues there is no basis to imply a waiver because he was an unsophisticated minor, was not very bright intellectually, and was tired after being in jail for five hours before questioning. But neither a low I.Q. nor any particular age of minority is a proper basis to assume his inability to voluntarily waive Miranda rights. (*People v. Lewis* (2001) 26 Cal.4th 334, 384 [rejecting the claim that a 13 year old lacked capacity to waive Miranda rights]; *In re Charles P.* (1982) 134 Cal.App.3d 768, 772 [upholding waiver of *Miranda* rights by a 12 year old]; *see also In re James B.* (2003) 109 Cal.App.4th 862, 873 [waiver of *Miranda* rights by a 12 year old].) Nor is there any evidence defendant was sleepy or exhausted when the detectives questioned him at 7:23 p.m. Defendant's demeanor during questioning disclosed that he was alert and coherent, although concerned about his situation. The fact that defendant was able to respond to the detectives' questions in a meaningful way demonstrated his education and age were not impediments to his understanding and waiving his *Miranda* rights.

Slip Op. at 4-6.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that certain warnings must be given before a suspect's statements made during custodial interrogation can be admitted in evidence. *Dickerson v. United States*, 530 U.S. 428, 431 (2000) (citing *Miranda*, 384 U.S. 436). "These warnings (which have come to be known colloquially as '*Miranda* rights') are: a suspect 'has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *Id.* at 435 (quoting *Miranda*, 384 U.S. at 479). However, "no talismanic incantation [is] required to

8

satisfy [*Miranda*'s] strictures," *California v. Prysock*, 453 U.S. 355, 359 (1981), and the

Supreme Court "has never insisted that *Miranda* warnings be given in the exact form described

in that decision," *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989).  In reviewing the adequacy of a

set of *Miranda* warnings, "[t]he inquiry is simply whether the warnings reasonably 'conve[y] to

[a suspect] his rights as required by *Miranda*.'" *Id.* at 203 (quoting *Prysock*, 453 U.S. at 361

(second and third alterations in original)).

Not only must the suspect be informed of his *Miranda* rights, the suspect must also waive

those rights before any statement he makes will be admissible at trial.  *Miranda*, 384 U.S. at 436.

A *Miranda* waiver must be knowing, intelligent, and voluntary.  *Colorado v. Spring*, 479 U.S.

564, 573 (1987).   This inquiry "has two distinct dimensions."  *Moran v. Burbine*, 475 U.S. 412,

421 (1986).

> First the relinquishment of the right must have been voluntary in
> the sense that it was the product of a free and deliberate choice
> rather than intimidation, coercion, or deception. Second, the waiver
> must have been made with a full awareness both of the nature of
> the right being abandoned and the consequences of the decision to
> abandon it. Only if the "totality of the circumstances surrounding
> the interrogation" reveal both an uncoerced choice and the requisite
> level of comprehension may a court properly conclude that the
> *Miranda* rights have been waived.

*Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

Such a waiver, however, does not need to be explicit.  *North Carolina v. Butler*, 441 U.S.

369, 373 (1979) ("An express written or oral statement of waiver . . . is not inevitably either

necessary or sufficient to establish waiver."); *see also Berghuis v. Thompkins*, 560 U.S. __, 130

S.Ct. 2250, 2261-62, 176 L.Ed.2d 1098 (2010).  A waiver of *Miranda* rights may be implied

through "the defendant's silence, coupled with an understanding of his rights and a course of

conduct indicating waiver."  *Butler*, 441 U.S. at 373.  "Where the prosecution shows that a

*Miranda* warning was given and that it was understood by the accused, an accused's uncoerced

statement establishes an implied waiver of the right to remain silent."  *Thompkins*, 130 S.Ct. at

2262.[2]  "[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Butler*, 441 U.S. at 374-65 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)) (other citations omitted).

This "totality of the circumstances" approach to determining waiver is equally applicable when the suspect is a juvenile.  *Fare*, 442 U.S. at 725.  "This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Id.* (citing *Butler*, 441 U.S. 369); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (the characteristics of the accused can include the suspect's age, education, and intelligence); *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (experience with law enforcement is another factor to consider).  The Supreme Court, however, "has emphasized that admissions and confessions of juveniles require special caution." *In re Gault*, 387 U.S. 1, 45 (1967); *see also Haley v. Ohio*, 332 U.S. 596, 599-600 (1948); *Doody v. Ryan*, __ F.3d __, 2011 WL 1663551, at *18-19 (9th Cir. 2011).

Petitioner's challenges to the particular incantation of the *Miranda* warnings he received amount to distinctions without a difference.  Police interrogating a suspect cannot make a guarantee that a suspect's statements *will* be used in court.  Perhaps the suspect's statement will convince the authorities that the suspect is innocent of the crime.  Perhaps the suspect will later plead guilty and his statement will never be used to convict him before a jury of his peers.  *Miranda* only requires authorities performing a custodial interrogation of a suspect to inform the suspect of the *possibility* that his or her statements *could* be admitted as evidence in court.  *See*

---

[2]     While *Thompkins* was decided in 2010, two years after the California Court of Appeal's determination in this case, it did not pronounce any new law with regard to waiver of *Miranda* rights.  It does, however, accurately summarize the state of clearly established federal law as was available to the California Court of Appeal at the time of its decision.  *See Thompkins*, 130 S.Ct. at 2261-62.

1   *Miranda*, 384 U.S. at 479 (suspect must be informed "that anything he says *can* be used against

2   him in a court of law" (emphasis added)); *id.* at 444 (Summarizing the Court's holding and

3   stating that prior to questioning a suspect must be informed "that any statement he does make

4   *may* be used as evidence against him." (emphasis added)); *see also Spring*, 497 U.S. at 574 (The

5   *Miranda* warnings include "the critical advice that whatever [the suspect] chooses to say *may* be

6   used as evidence against him." (emphasis added)).   The California Court of Appeal's

7   determination that Petitioner was adequately informed of the possibility that anything he said to

8   the detectives could later be used against him in court was objectively reasonable.

9          Petitioner's challenge to the *Miranda* warning on the basis that it did not inform him of

10  his right to consult with his attorney is equally unavailing.  Petitioner was warned that he had "a

11  right to the presence of an attorney before and during any questioning."  Clerk's Tr. at 808.  Even

12  a fourteen-year-old would understand that this encompassed more than a right to have an attorney

13  sit next to him before and during questioning, without the ability to communicate with the

14  attorney or for the attorney to act on your behalf.  The presence of an attorney necessarily implies

15  the counsel of that attorney.  While *Miranda* did hold "an individual held for interrogation must

16  be clearly informed that he has a right to *consult* with a lawyer and to have the lawyer with him

17  during interrogation," *Miranda*, 384 U.S. at 471-72 (emphasis added), this can reasonably be

18  interpreted as a statement that the suspect must be warned of his right to the presence of an

19  attorney before questioning.  One cannot contemporaneously answer a question from an officer

20  and obtain advice from counsel, the right to consult with an attorney means the right to the

21  presence of an attorney before questioning.  Indeed, in other portions of the *Miranda* opinion the

22  court refers only to the presence of an attorney, *id.* at 479 (suspect "has the right to the presence

23  of an attorney"); *id.* at 444 (same); *see also Moran v. Burbine*, 475 U.S. 412, 420 (1986)

24  (*Miranda* imposes an obligation on officers to inform a suspect of his right to "'have counsel

25  present . . . if [he] so desires'" (quoting *Miranda*, 384 U.S. at 468-70)), and the Court found it

26  was the  presence of an attorney that sufficiently protected a suspect's rights, *Miranda*, 384 U.S.

1    at 456 (the presence of counsel is an adequate protective device); *see also id.* at 469-70.  The

2    California Court of Appeal reached a reasonable conclusion when it determined that the

3    detective's warning to Petitioner reasonably conveyed to Petitioner that he had a right to counsel

4    before and during any questioning.

5         Petitioner also claims that he did not validly waive his *Miranda* rights.  After petitioner

6    was read his *Miranda* rights, the detective asked: "Do you understand those rights?"  Petitioner

7    nodded that he understood.  Clerk's Tr. at 809.  Petitioner then went on to answer the detectives'

8    questions without asserting his right to remain silent or asking for an attorney.  In the course of

9    the interrogation, in which Petitioner made several incriminating statements, Petitioner never

10   indicated that he did not understand a question.  Indeed, a review of the transcript leaves one with

11   the impression that Petitioner was able to converse with the detectives in a manner that is not

12   readily distinguishable from an average adult under similar circumstances.  *But see Gallegos v.*

13   *Colorado*, 370 U.S. 49, 54 (1962) ("[A] 14-year-old boy, no matter how sophisticated, is unlikely

14   to have any conception of what will confront him when he is made accessible only to the police. .

15   . . He cannot be compared with an adult in full possession of his senses and knowledgeable of

16   the consequences of his admissions.").  While Petitioner claims that he is of limited education,

17   receiving exclusively Fs on his report card, the Court of Appeal aptly concluded "[t]he fact that

18   defendant was able to respond to the detectives' questions in a meaningful way demonstrated his

19   education and age were not impediments to his understanding and waiving his *Miranda* rights."

20   Slip Op. at 6.  As the trial judge noted with regard to Petitioner during an evidentiary hearing on

21   Petitioner's motion to suppress: "He's smart, he just didn't apply himself."  Rep.'s Tr. at 32; *see*

22   *also id.* at 54.   Furthermore, the trial court concluded after viewing the video of the interrogation

23   that Petitioner was alert throughout the questioning, did not appear to be tired, to have any

24   mental disability or defect, or be under the influence of alcohol or drugs, and that the detectives

25   were not deceptive and the information they gave Petitioner was accurate.  *Id.* at 55.

26   / / /

Viewing the totality of the circumstances, everything except Petitioner's young age suggests Petitioner made a knowing, voluntary, and intelligent waiver of his *Miranda* rights. A suspect's age, alone, is not enough to invalidate a waiver of *Miranda*. *Fare*, 442 U.S. at 725. Petitioner was clearly informed of his *Miranda* rights, nodded that he understood them, yet chose to make a statement to the police.

Additionally, Petitioner's assertion that his statement must be suppressed because he was only told he was being questioned with regard to some guns which were found in the vehicle he was arrested in, and not that he was being questioned with regard to a murder investigation, lacks merit. In *Colorado v. Spring*, the Supreme Court held "that a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." 479 U.S. at 577. The California Court of Appeal reached a reasonable conclusion under controlling Supreme Court precedent when it determined, under the totality of the circumstances, Petitioner had validly waived his *Miranda* rights. As such, Petitioner is not entitled to habeas relief on this claim.

2. Claim II

In Claim II, Petitioner argues that his statement to police should have been suppressed because the statement was involuntary and a result of coercion, in violation of due process. Specifically, Petitioner alleges the detectives who interrogated him implied that if he told the truth he would not be charged with murder and the detectives coerced Petitioner into speaking by asking him to think what his mother would think if he were charged with murder.

With regard to this Claim, the California Court of Appeal determined as follows:

> We conclude that the videotape of the interview and the totality of the circumstances show defendant's statements were voluntary and uncoerced. During the interview, which was not lengthy, the detectives were not overbearing or intimidating. They made sure defendant had been fed and treated him in a manner appropriate for a boy of his age. Defendant understood their questions and answered them coherently. In determining voluntariness, the

13

critical issue is "whether the defendant's 'will was overborne at the time he confessed.'" (*People v. Maury* (2003) 30 Cal.4th 342, 404; *see also*, *e.g.*, *In re Shawn D.*, *supra*, 20 Cal.App.4th at p. 208.) It was not.

Defendant disagrees with this assessment and argues the detectives impermissibly made an implied promise that if he told the truth, he would not be prosecuted for murder. He relies on specific portions of the interview which, when viewed in context, do not support his claim.

During the interview, one of the detectives said: "I don't think that you want to be involved in a homicide investigation. I already know that you were out there when Adrian was shot so don't tell me that you weren't there. [¶] You are 14 years old. You do not want to spend the rest of your life in jail or prison or CYA or wherever because you are part of this. [¶] Now is the time to start distancing yourself from who I already know pulled the trigger."

Defendant asked why he was being questioned. The detective replied: "Because people are putting you there and that makes you involved. It makes you involved in conspiracy to commit murder. And that, basically-conspiracy to commit murder is basically the same as committing murder. [¶] If you weren't part of the planning of that homicide or a part of the commission of that homicide, there is no reason for you to go to prison for the rest of your life. Just being there, I mean, don't get me wrong, being there is a problem, but it's a much better problem to have to deal with than being part of a homicide."

After telling defendant that David had been arrested, the detective stated: "Whether anyone else gets charged with murder is based on basically how honest they are and how forthcoming they are with me when they sit in that chair. [¶] I already know that he shot and killed Adrian. You don't need to compound your problems by sitting here and trying to protect him or lying to me because that's not going to help you. [¶] You got to think about Adrian's family. You got to think about the guy that was killed, that family. You got to think about yourself, your family, your mom. Do you think your mom wants me to call her and tell her that you were arrested for murder tonight?"

The detective informed defendant that others had placed defendant at the scene. He explained that if defendant is "just standing out there and shit breaks out around you and you didn't know anything about it, that's one thing. But if you are part of it, if you are out there yelling, screaming, telling someone to get a gun, telling them to shoot him, something like that, yeah, that's a lot different. But I don't think you were actually out there yelling, shoot em, shoot em. [¶] Am I right?"

Defendant nodded and the detective replied: "I didn't think so. You're 14 years old. You got caught up in the wrong place at the wrong time, didn't you?" At that point, defendant said that he was there but did not know David was going to shoot anyone. The detective later told defendant: "You don't want to sit here and lie to me and tell me that you don't know what happened when other people have already told me what happened. You don't want to drag yourself into this. When you lie to me, that means that you become part of the conspiracy and that's when you get arrested for conspiracy to commit murder. [¶] Like I said, I don't think you want to be here for that. I don't think that's what you did. But if you sit here and lie to me, then it makes me think that you were part of it." Soon thereafter, defendant revealed that he had called David to bring the gun and, when David arrived, defendant told him "kill 'em," meaning Adrian and his friends.

"'[W]here a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess, the confession is involuntary and inadmissible as a matter of law.'" (*People v. Williams*, *supra*, 16 Cal.4th at p. 660.) But "investigating officers are not precluded from discussing any 'advantage' or other consequence that will 'naturally accrue' in the event the accused speaks truthfully about the crime. [Citation.] The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable. [Citations.]" (*People v. Ray* (1996) 13 Cal.4th 313, 340.)

Here, there is no evidence that a promise of leniency prompted defendant's confession. Rather, the detective's comments advised defendant that if he lied to protect David or others involved in the murder, defendant could be charged with conspiracy to commit murder; thus, he should be honest to avoid this fate. As the detective stated, "You don't want to drag yourself into this." But the detective also advised him that if he was actually involved in the murder and told someone to get a gun and shoot the victims, "that's a lot different." Viewed in context, the detective's statements conveyed that liars who protect participants in the murder could be charged with conspiracy to commit murder, not that participants will not be prosecuted if they are honest about their involvement.

Under the totality of the circumstances, defendant's statements were voluntary, and the trial court properly allowed them to be introduced into evidence.

Slip Op. at 7-8.

/ / /

15

In determining the voluntariness of a confession, a court "examines whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." *Dickerson*, 530 U.S. at 434 (citation and internal quotation marks omitted). "The due process test takes into consideration the totality of all the surrounding circumstances–both the characteristics of the accused and the details of the interrogation." *Id.* (citations and internal quotation marks omitted). It is not sufficient for a court to consider the circumstances in isolation. Instead, "all the circumstances attendant upon the confession must be taken into account." *Reck v. Pate*, 367 U.S. 433, 440 (1961) (citations omitted).

As the Supreme Court has observed, "[t]he application of these principles involves close scrutiny of the facts of individual cases." *Gallegos*, 370 U.S. at 52. "The length of the questioning, the use of fear to break a suspect, [and] the youth of the accused are illustrative of the circumstances on which cases of this kind turn." *Id.* (citations omitted). Thus, we ask: "Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Schneckloth*, 412 U.S. at 225-26 (citation omitted).

The California Court of Appeal reached a reasonable conclusion when it determined Petitioner's statement was not a result of coercion. As the court noted, viewing the detectives' statements in light if the entire interrogation, the detectives did not make any promises of leniency to Petitioner. The detectives accurately informed Petitioner that if he lied to protect those involved in the murder he could be involved in a conspiracy. They also informed him that, although they did not think he was involved in the murder, he could face serious consequences: "If you were just standing out there and shit breaks out around you and you didn't know anything about it, that's one thing. But if you are part of it, if you are out there yelling, screaming, telling someone to get a gun, telling them to shoot him, something like that, yeah, that's a lot different. But I don't think you were actually out there yelling shoot em, shoot em." Clerk's Tr. at 820. As

1   it turns out, Petitioner later admitted to doing just that: calling his friend David and telling him to

2   bring a gun, *id.* at 826, and, once David arrived, telling David to "kill em." *id.* at 828.  As with

3   the voluntariness of Petitioner's *Miranda* waiver, *see* Claim I, *supra*, the only factor that weighs

4   in favor of a finding that Petitioner's statements were involuntary is Petitioner's age.  All other

5   factors indicate that Petitioner's statement was made voluntarily.  As such, the Court of Appeal's

6   determination was reasonable and Petitioner is not entitled to habeas relief on Claim II.

7       3.  Claim III

8       In his third claim for relief, Petitioner claims that his convictions for first degree murder

9   and three counts of attempted murder were based on insufficient evidence.  Specifically,

10  Petitioner alleges that there exists insufficient evidence in the record of his intent to kill the

11  victims and insufficient evidence that his actions were premeditated and deliberate.  In ruling on

12  this claim, the California Court of Appeal stated as follows:

13          We next reject defendant's argument that we must reverse the
14          murder and attempted murder convictions because there was
            insufficient evidence that he harbored the requisite intent to kill the
            victims.
15

16          Attempted murder requires the specific intent to kill. (*People v.
            Lee* (2003) 31 Cal.4th 613, 623.) "First degree murder may be
17          found when the prosecution proves beyond a reasonable doubt that
            the actor killed with malice aforethought, intent to kill,
            premeditation, and deliberation." (*People v. Memro* (1995) 11
18          Cal.4th 786, 862; *see also* Pen.Code, §§ 187, 189.) Intent to kill is
            rarely proved by direct evidence; rather, it must usually be inferred
19          from circumstantial evidence. (*People v. Ramos* (2004) 121
            Cal.App.4th 1194, 1207-1208.)
20

21          Defendant contends he simply told David to shoot the victims,
            which is not the same as urging him to kill them. Defendant fails to
            give due deference to the relevant standard of review.
22

23          "'The proper test for determining a claim of insufficiency of
            evidence in a criminal case is whether, on the entire record, a
24          rational trier of fact could find the defendant guilty beyond a
            reasonable doubt. [Citations.] On appeal, we must view the
            evidence in the light most favorable to the People and must
25          presume in support of the judgment the existence of every fact the
            trier could reasonably deduce from the evidence. [Citation.] [¶]
26          Although we must ensure the evidence is reasonable, credible, and

17

of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation .] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' [Citation.]" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

In his statement to the detectives, defendant admitted that on the night of the murder, he summoned David, a fellow gang member, to bring a gun because Adrian and his friends had been disrespecting defendant's sister and "disrespecting [defendant's] house." After calling David, defendant told Vanessa his "homies" were coming with a gun and it would not be defendant's fault if Adrian got "blasted." Defendant threatened to kill Isael. He told the detectives that after David arrived, defendant urged David to "kill 'em" and "shoot 'em," meaning Adrian and his friends, because defendant wanted any Norteno shot. In other words, he intended to kill them all. This is ample evidence that defendant harbored the specific intent to kill Adrian, Gustavo, Isael, and Albert.

Defendant appears to argue that *People v. Bland* (2002) 28 Cal .4th 313 (hereafter Bland ) dictates a different result with respect to the three attempted murder counts because there is no evidence that defendant specifically intended to kill Albert, Gustavo, and Isael after Adrian was killed.

Bland held that attempted murder requires the specific "inten[t] to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*Bland*, *supra*, 28 Cal.4th at p. 328.) But *Bland* also held that there could be a concurrent intent such that "a person who shoots at a group of people [may still] be punished for the actions towards everyone in the group even if that person primarily targeted only one of them." (*Id.* at p. 329.) Concurrent intent can be inferred " 'when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity,' " which is referred to as a "kill zone." (*Ibid.*)

Defendant intimates Adrian was the primary target and there is no evidence that defendant or David had the intent to kill Gustavo, Isael, and Albert after Adrian was shot. In his view, Adrian's companions were scattering and out of harm's way when David continued shooting, which means David was intending only to drive them off or to commit an assault.

18

"*Bland* did not suggest that the 'kill zone' was the only way to establish concurrent intent to kill more than one person in a fired-upon group. [¶] "'The act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill. . . .'" '[Citation.]" *(People v. Campos* (2007) 156 Cal.App.4th 1228, 1242.) That is one interpretation of what occurred in this case. Defendant wanted Nortenos killed and urged the gun-toting David to "kill 'em," meaning Adrian, Gustavo, Isael, and Albert. Defendant did not say "kill Adrian" or "kill one of them"; he said "kill 'em" and unleashed David and his rifle on all four of the Nortenos, who were armed with only rocks. This supports an inference of an intent to kill all four men.

In defendant's reply brief, he observes the People failed to respond to defendant's argument that there is insufficient evidence of premeditation and deliberation to support the murder and attempted murder counts. However, defendant's three-page argument in his opening brief does not include any analysis of the minimum evidence required to support a finding of premeditation and deliberation. It discusses only the lack of an intent to kill and merely contains a throw away line at the close of his argument "that an intent to kill and premeditation and deliberation are not supported by the evidence." Therefore, the argument is forfeited because of defendant's failure to adequately develop and support it in his opening brief. (*People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2 [a reviewing court need not discuss claims asserted perfunctorily and insufficiently developed]; *People v. Galambos* (2002) 104 Cal.App.4th 1147, 1159 [appellate contentions must be supported by analysis]; *People v. Baniqued* (2000) 85 Cal.App.4th 13, 29 [omissions in opening briefs cannot be rectified in reply briefs].)

In any event, there is ample evidence of premeditation and deliberation.

"'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080; *accord*, *People v. Halvorsen* (2007) 42 Cal.4th 379, 419.) The processes can occur rapidly, even after an altercation is underway. (*People v. Mayfield* (1997) 14 Cal.4th 668, 767; *People v. Sanchez* (1995) 12 Cal.4th 1, 34.)

The types of evidence that typically support a finding of premeditation and deliberation are planning activity, a relationship

19

1  with the victim or conduct from which a motive can be inferred,
   and a manner of killing or attempted killing from which a
2  preconceived plan can be inferred. (*People v. Anderson* (1968) 70
   Cal.2d 15, 26-27.) However, these categories are not prerequisites;
3  they are guidelines to assist reviewing courts in assessing whether
   the evidence supports an inference that a killing or attempted
4  killing resulted from preexisting reflection and a weighing of
   considerations rather than an unconsidered or rash impulse.
5  (*People v. Sanchez*, *supra*, 12 Cal.4th at pp. 32-33.)

6  Here, defendant became agitated over the Nortenos' lack of
   respect, challenged them to fight, and threatened to kill Isael. After
7  the Norteno group left, defendant chose to telephone David and ask
   him to bring a gun. He then told Vanessa that his "homies" were
8  coming with a gun and indicated Adrian might get "blasted." The
   Nortenos returned and, when David and Larry arrived armed with a
9  rifle and bottles, the Nortenos armed themselves with rocks.
   Defendant told David to "kill 'em."

10
   These facts reflect that defendant made a premeditated and
11 deliberate decision to escalate a verbal altercation into a deadly one
   by instigating David to bring a firearm to the fracas and then urging
12 David to use it in a deadly manner. Substantial evidence supports a
   finding of premeditation and deliberation.

13

14 Slip Op. at 8-11.

15         The Due Process Clause of the Fourteenth Amendment "protects the accused against

16 conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

17 crime for with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  There is

18 sufficient evidence to support a conviction if, "after viewing the evidence in the light most

19 favorable to the prosecution, any rational trier of fact could have found the essential elements of

20 the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  "[T]he

21 dispositive question under *Jackson* is 'whether the record evidence could reasonably support a

22 finding of guilt beyond a reasonable doubt.'"  *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir.

23 2004) (quoting *Jackson*, 443 U.S. at 318).  A petitioner for writ of habeas corpus "faces a heavy

24 burden when challenging the sufficiency of the evidence used to obtain a state conviction on

25 federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).

26 / / /

20

1    A federal habeas court determines the sufficiency of the evidence in reference to the

2    substantive elements of the criminal offense as defined by state law.  *See Jackson*, 443 U.S. at

3    324 n. 16.  Murder is defined by California Law as "the unlawful killing of a human being . . .

4    with malice aforethought." *See* Cal. Penal Code § 187(a).  Murder in the first degree is defined as

5    follows:

> All murder which is perpetrated by means of a destructive device
> or explosive, a weapon of mass destruction, knowing use of
> ammunition designed to primarily penetrate metal or armor,
> poison, lying in wait, torture, or by any other kind of willful,
> deliberate, and premeditated killing, or which is committed in the
> perpetration of, or attempt to perpetrate arson, rape, carjacking,
> robbery, burglary, mayhem, kidnapping, train wrecking, or any
> action punishable under Section 206, 286, 288, 288a, or 289, or
> any murder which is perpetrated by means of discharging a firearm
> from a motor vehicle, intentionally at another person outside of the
> vehicle with the intent to inflict death, is murder of the first degree.

12   Cal. Penal Code § 189.  "Attempted murder requires the specific intent to kill and the

13   commission of a direct but ineffectual act toward accomplishing the intended killing." *People v.*

14   *Superior Court*, 41 Cal. 4th 1, 7, 58 Cal. Rptr. 3d 421, 157 P.3d 1017 (2007).

15   Petitioner's statement to the police, which was admitted into evidence through the

16   testimony of one of the interviewing detectives, *see* Rep.'s Tr. at 778-79, contains ample

17   evidence from which, viewed in the light most favorable to the prosecution, a jury could

18   conclude Petitioner to be guilty of first degree murder and three counts of attempted murder.  In

19   pertinent part:

20       Q:      Okay.  So when they went to pick you up, what happened?

21       A:      He was out there.

22       Q:      Who was out there?

23       A:      Him.

24       Q:      Who is him?

25       A:      Adrian.

26       Q:      Do you know Adrian?

1     A:     (Witness nods).

2     Q:     How do you know Adrian?

3     A:     My mom's friends (unintelligible) –

4     Q:     How long have you known him?

5     A:     A couple years.

6     Q:     Is that Adrian?  (Indicating)

7     A:     Yeah.

8     Q:     Is Adrian Norteno?

9     A:     (Witness nods).

10    Q:     What set does he claim?

11    A:     South Central.

12    Q:     How do you know him to be South Central?

13    A:     I got arrested on Pine Street (unintelligible).

14    Q:     So when they got there to pick you up, where did they park?

15    A:     In my driveway.

16    Q:     In your driveway?

17    A:     Yeah.

18    Q:     Did you get in the car?

19    A:     No.

20    Q:     What happened?

21    A:     I was walking up to Adrian.

22    Q:     Why were you walking up to Adrian?

23    A:     Because of what he was saying to me.

24    Q:     What was he saying?

25    A:     "Scrap.  You ain't shit."  Before they were saying shit to my sister.

26

1  Q:  Who was with Adrian?

2  A:  Some little kids.

3  Q:  Do you know who they were?

4  A:  No.

5  Q:  Were they Nortenos?

6  A:  (witness nods).

7  Q:  You were walking up to Adrian.
      Had you already gotten in the car with Larry and David?

8

9  A:  No.

   Q:  Were they there yet?

10 A:  Yeah.

11 Q:  Where were they when you were walking up to Adrian?

12 A:  In my driveway.

13 Q:  In the alley or just on Elm Street?

14 A:  On Elm Street.

15 Q:  Okay. Did you know that he [David] had the gun?

16 A:  Yeah.

17 Q:  How did you know that he had the gun?

18 A:  (Unintelligible).

19 Q:  Did you call him and tell him to come over to your house
      and bring a gun?

20

21 A:  Yeah.

22 Q:  Why did you do that?

23 A:  Because the night before that two guys went to my house
      and was saying shit to my sister (unintelligible).

24

   Q:  Do you know how old or who these people were that came
      to your house and were talking shit to your sister?

25

26 A:  No.

1    Q:    Was it Adrian?

2    A:    No – I don't know.  My sister said they seen him.

3    Q:    How old is your sister?

4    A:    My sister's ten years old.

5    Q:    What were they saying to her?

6    A:    Scrap.  Bitch.  (Unintelligible)  If they got a problem they should say it to me.

7

8    Q:    Okay.  So then when you called them over, did you get in the car when they first got there?

9    A:    No.

10    Q:    So they just showed up?
What did you tell them when you told them to come over?

11

12    A:    Told them they were disrespecting my house.

    Q:    Who did you call, Larry or David?

13    A:    David.

14    Q:    You told them they were disrespecting your house?

15    A:    Yeah.

16    Q:    What did you ask them to do?

17    A:    I don't know.

18    Q:    Did you tell them what to do with the gun?

19    A:    (Negative headshake).

20    Q:    You just told them to bring the gun?

21    A:    Yeah.

22    Q:    Okay.  Where were you when they pulled up into your driveway?

23

24    A:    The house next to mine, my friend's.

25    Q:    Okay.  And what happened then?  Did you see him pull up?

26    A:    Yeah.

| | | |
|---|---|---|
| 1 | Q: | And Larry was driving.  And where was David? |
| 2 | A: | Back seat. |
| 3 | Q: | Who else was with him? |
| 4 | A: | No one else. |
| 5 | Q: | Okay, what happened when – after they got there? |
| 6 | A: | I don't know.  Everything went fast. |
| 7 | Q: | Let's try and back it up and take it slow and kind of see how we could figure out what happened. |
| 8 | | They pull up in the car and David gets out of the back seat.  Is he holding anything in his hands? |
| 9 | | |
| 10 | A: | I didn't really look at David. |
| 11 | Q: | Did David have the gun? |
| 12 | A: | Yeah. |
| 13 | Q: | Yeah.  What was he doing with the gun? |
| 14 | A: | I don't know. |
| 15 | Q: | Was he holding it or pointing it at someone or pointing it in the air? |
| 16 | A: | He was just holding it like this (indicating). |
| 17 | Q: | Did he say anything? |
| 18 | A: | Huh-uh. |
| 19 | Q: | Did you say anything? |
| 20 | A: | Yeah. |
| 21 | Q: | What did you say? |
| 22 | A. | "Kill em."[3] |
| 23 | Q: | Did you tell him who to kill?  Were you pointing at someone? |
| 24 | | |

3 Later in the questioning, Petitioner tells the detectives that he said "shoot em," not "kill em."  *See* Clerk's Tr. at 844 (Q: Okay and you said to shoot him or to kill him?  A: I think shoot.)

1              A:       (Indicating).

2              Q:       Who was out there at that time?

3              A:       Adrian and his friends.

4              Q:       Is that who you meant when you said, "kill em"?

5              A:       Yeah, I guess.

6              Q:       Okay.  What happened after you said "kill em"?

7              A:       I heard gunshots.

8 Clerk's Tr. at 825-29.  Later in the interrogation, a detective asked some clarifying questions:

9              Q:       The only thing I didn't understand was, when you saw
                          Adrian and his friends down there, who was it that you

10                           were pissed at?  Was it Adrian or was it his friends or who
                          was it?

11

12              A:       One of his friends.

             Q:       One of his friends.  Did – who was it that you wanted shot?

13                           Was it Adrian or was it his friend?

14              A:       I don't know.

15              Q:       Or was it just any Norteno?

16              A:       Yeah.

17              Q:       It didn't really matter?

18              A:       Yeah.

19              . . . .

20              Q:       When you said "kill em," did you mean Adrian?

21              A:       (Negative headshake).

22              Q:       You just meant anyone?

23              A:       Yeah.

24 *Id.* at 833, 835.

25 / / /

26 / / /

1    Intent to kill is rarely proved by direct evidence; rather, it must usually be inferred from

2    circumstantial evidence. *People v. Ramos* 121 Cal. App. 4th 1194, 1207-1208, 18 Cal. Rptr. 3d

3    167 (2004). Here, the jury could have inferred Petitioner's intent to kill Adrian, as well as the

4    three other juveniles present, from his statement to David to "kill em." When asked who he

5    meant when he said "kill em," Petitioner agreed that he meant Adrian and his friends, saying

6    "Yeah, I guess." He further corroborated this statement when he agreed that he just wanted any

7    Norteno shot, and that he just meant anyone when he said "kill em." Viewed in the light most

8    favorable to the prosecution, a jury could infer, from these statements alone, that Petitioner had

9    the intent to kill not only Adrian, but Adrian's three friends as well. The Court of Appeal

10   reached a reasonable determination when it found that there was sufficient evidence for a jury to

11   find, under California law, that Petitioner intended to kill all four juveniles.

12   Additionally, Petitioner contends there was insufficient evidence of premeditation and

13   deliberation. "Deliberation refers to careful weighing of considerations in forming a course of

14   action; premeditation means thought over in advance. The process of premeditation and

15   deliberation does not require any extended period of time. The true test is not the duration of

16   time as much as it is the extent of the reflection. Thoughts may follow each other with great

17   rapidity and cold, calculated judgment may be arrived at quickly. . . ." *People v. Koontz*, 27 Cal.

18   4th 1041, 1080, 46 P.3d 335, 119 Cal. Rptr. 2d 859 (2002) (internal citations and quotations

19   omitted); *accord*, *People v. Halvorsen*, 42 Cal. 4th 379, 419, 165 P. 3d 512, 64 Cal. Rptr. 3d 721

20   (2007). The processes can occur rapidly, even after an altercation is underway. *People v.*

21   *Mayfield*, 14 Cal. 4th 668, 767, 928 P. 2d 485, 60 Cal. Rptr. 2d 1(1997); *People v. Sanchez*, 12

22   Cal. 4th 1, 34, 906 P. 2d 1129, 47 Cal. Rptr. 2d 843 (1995) *abrogated on other grounds by*

23   *People v. Doolin*, 45 Cal. 4th 390, 198 P. 3d 11, 87 Cal. Rptr. 3d 209 (2009). In this case,

24   premeditation and deliberation can be inferred from Petitioner's statement that he called David

25   and told him to bring a gun. At the point Petitioner made that phone call, only words had been

26   exchanged between the rival gang members. It was Petitioner who chose to raise the stakes by

27

1   asking his friend to bring a gun.  A jury could reasonably infer that this showed premeditation

2   and deliberation on Petitioner's part.  Petitioner fails to meet his heavy burden to warrant

3   granting federal habeas relief on this insufficiency of the evidence argument.

4           4. Claim IV

5           In Claim IV, Petitioner raises challenges to the jury instructions on attempted murder and

6   to additional instructions that were given to the jury in response to questions from the jury on

7   first degree murder.  Petitioner claims that the instruction given on attempted murder allowed the

8   jury to find him guilty without a finding that he intended to kill each and every one of the victims

9   individually: "The jurors were instructed that when one shoots at a person in a group one has the

10   necessary intent for everyone, effectively transferred intent contrary to California law."  With

11   regard to first degree murder, Petitioner claims that the responses by the court to questions asked

12   by the jury permitted a finding of first degree murder without premeditation and deliberation.

13          A challenge to a jury instruction solely as an error of state law does not state a claim

14   cognizable in a federal habeas corpus action.  *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).

15   To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the

16   ailing instruction by itself so infected the entire trial that the resulting conviction violates due

17   process.  *See id.* at 72.  Additionally, the instruction may not be judged in artificial isolation, but

18   must be considered in the context of the instructions as a whole and the trial record.  *See id.*  The

19   court must evaluate jury instructions in the context of the overall charge to the jury as a

20   component of the entire trial process.  *See United States v. Frady*, 456 U.S. 152, 169 (1982).

21   Furthermore, even if it is determined that the instruction violated the petitioner's right to due

22   process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial

23   influence on the conviction and thereby resulted in actual prejudice under *Brecht v. Abrahamson*,

24   507 U.S. 619, 637 (1993), which is whether the error had substantial and injurious effect or

25   influence in determining the jury's verdict.  *See, e.g.*, *Hedgpeth v. Pulido*, 555 U.S. 57, 129 S.Ct.

26   530, 532 (2008) (per curiam).

1          a.  Attempted Murder

2      In ruling on Petitioner's claim regarding the attempted murder jury instruction,

3   CALCRIM No. 600, the Court of Appeal found as follows:

4          Defendant contends the trial court erred in instructing the jury with
           CALCRIM No. 600, which is based on language in [*People v.*]
5          *Bland*, *supra*, 28 Cal.4th 313.

6          In relevant part, the court instructed the jury: "A person may intend
           to kill a person-may intend to kill a specific victim or victims and
7          at the same time *intend to kill anyone* in a particular zone of harm
           or 'kill zone.' [¶] In order to convict the defendant of the attempted
8          murder of Gustavo Teran, Isael Teran, or Alberto [sic] Blanco, the
           People must prove that the defendant not only intended to kill
9          Adrian Cortez, but also either intended to kill Gustavo Teran, Isael
           Teran and Alberto [sic] Blanco or intended to kill anyone within
10         the 'kill zone.' [¶] If you have a reasonable doubt whether the
           defendant intended to kill Gustavo Teran, Isael Teran or Albert
11         Blanco, or intended to kill Adrian Cortez *by harming everyone in
           the 'kill zone,'* then you must find the defendant not guilty of the
12         attempted murder of Gustavo Teran, Isael Teran or Alberto [sic]
           Blanco." (Italics added.)

13

14         Defendant's challenge to the instruction is not a model of clarity.
           As best we can discern, he believes the instruction incorrectly
15         conveys that the jury could find him guilty of three counts of
           attempted murder if he (1) intended only to harm people in the kill
16         zone, rather than to kill them, and (2) intended to kill anyone in the
           area, rather than everyone.

17
           In reviewing the claim of error, "'we inquire "whether there is a
18         reasonable likelihood that the jury has applied the challenged
           instruction in a way" that violates the Constitution.' [Citations.]"
19         (*People v. Frye* (1998) 18 Cal.4th 894, 957.) In conducting this
           inquiry, we must view the challenged instruction in the context of
20         the overall charge, rather than judged in artificial isolation. (*Ibid.*;
           *see also People v. Smithey* (1999) 20 Cal.4th 936, 963.)

21
           We conclude that no reasonable juror would have construed the
22         challenged instruction as permitting three attempted murder
           convictions premised on a mere intent to harm the victims rather
23         than an intent to kill them. First, another portion of CALCRIM No.
           600 advised the jury that in order to find defendant guilty of the
24         attempted murder of Albert, Gustavo, and Isael, it had to find
           defendant intended to kill them. Second, the only way that
25         defendant could kill Adrian by harming everyone in the zone is if
           the harm inflicted was fatal harm; nonlethal harm would not result
26         in Adrian's death. If a person intentionally inflicts lethal harm on

everyone in the zone, it reasonably follows that the person necessarily intended to kill everyone in the zone.

As for defendant's claim that the instruction is infirm because it permitted the jury to find defendant guilty of three counts of attempted murder if he intended to kill anyone in the zone rather than everyone, a similar challenge to CALCRIM No. 600 was rejected in *People v. Campos*, *supra*, 156 Cal.App.4th 1228 (hereafter *Campos*). The defendant in *Campos* argued the decision in *Bland* established the "kill zone" concept and defined "kill zone" as a zone in which the assailant intends to kill "everyone" to ensure harm to a target victim. CALCRIM No. 600 defines the "kill zone" as the zone in which the defendant intends to kill "anyone." The defendant claimed that by using the word "anyone" instead of "everyone," the instruction improperly expanded the *Bland* "kill zone" concept and permitted a conviction for attempted murder "without proof that all members of the group were subjected to the risk of death, and, consequently, without the intent to kill all group members." (*Campos*, *supra*, 156 Cal.App.4th at p. 1241.) *Campos* concluded there was no reasonable likelihood that the jurors misconstrued or misapplied the words of the instruction in a manner that misled them regarding the requisite specific intent. (*Ibid.*) There, as here, the jury was properly instructed on the elements of attempted murder, including that the defendant harbor the specific intent to murder the person whose attempted murder is charged, and was also properly instructed on the definition of express malice. (*Id.* at p. 1243; *see* CALCRIM Nos. 520 & 600.) The "kill zone" portion of CALCRIM No. 600 is superfluous because the "theory 'is not a legal doctrine requiring special jury instructions, ... Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others.' [Citations.]" (*Campos*, *supra*, 156 Cal.App.4th at p. 1243.)

In addition, the instruction is not necessarily inconsistent with *Bland*. Although it states that proving defendant guilty of the attempted murder of Alberto [sic], Isael, and Gustavo required proof that defendant intended to kill not only Adrian but Alberto [sic], Isael, or Gustavo or *"anyone within the 'kill zone'"* (italics added), the instruction clarified that "[i]f you have a reasonable doubt whether the defendant intended to kill Gustavo Teran, Isael Teran or Albert Blanco, or intended to kill Adrian Cortez by harming everyone in the 'kill zone,' then you must find the defendant not guilty of the attempted murder of Gustavo Teran, Isael Teran or Alberto [sic] Blanco." (CALCRIM No. 600.) "This language is consistent with *Bland* and directed the jury that it could not find [defendant] guilty of attempted murder ... under a 'kill zone' theory unless it found that he intended to harm 'everyone' in the zone." (*Campos*, *supra*, 156 Cal.App.4th at p. 1243.)

/ / /

As the decision in *Campos* pointed out: "[T]here is little difference between the words 'kill anyone within the kill zone' and 'kill everyone within the kill zone.' In both cases, there exists the specific intent to kill each person in the group. A defendant who shoots into a crowd of people with the desire to kill anyone he happens to hit, but not everyone, surely has the specific intent to kill whomever he hits, as each person in the group is at risk of death due to the shooter's indifference as to who is his victim." (*Campos, supra*, 156 Cal.App.4th at p. 1243; *but see People v. Stone* (Mar. 4, 2008, F051812) --- Cal.App.4th ---- [where only one shot is fired into a crowd and only one attempted murder is charged, the kill zone theory is not applicable and, thus, it is error to instruct with CALCRIM No. 600].)

In any event, it is not reasonably probable that defendant would have obtained a more favorable result if the "kill zone" portion of the instruction had been omitted. (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1157 [misdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836].) As noted earlier, defendant threatened to kill Isael and warned Vanessa that her cousin, Adrian, could get "blasted" once defendant's "homies" arrived. Defendant expressly urged David to "kill 'em" and "shoot 'em," meaning Adrian, Gustavo, Isael, and Albert, because defendant wanted a Norteno shot, any Norteno. This evidence showed that defendant intended to have all of them killed. Simply stated, the evidence of his intent to kill was overwhelming under the "kill zone" theory or otherwise. (*Campos, supra*, 156 Cal.App.4th at p. 1244; *People v. Smith* (2005) 37 Cal.4th 733, 743 ["evidence that defendant purposefully discharged a lethal firearm at the victims, both of whom were seated in the vehicle, one behind the other, with each directly in his line of fire, can support an inference that he acted with intent to kill both"].)

For all of the reasons stated above, defendant's challenge to CALCRIM No. 600 fails.

Slip Op. at 11-13 (first bracket added).

In California, the transferred intent doctrine does not apply to inchoate crimes such as attempted murder. *People v. Bland*, 28 Cal. 4th 313, 317, 48 P. 3d 1107, 121 Cal. Rptr. 2d 546 (2002). "A person who intends to kill only one is guilty of the attempted (or completed) murder of that one but not also of the attempted murder of others the person did not intend to kill. Thus, . . . whether [a] defendant is guilty of the attempted murder of . . . surviving victims depends on

his mental state as to those victims and not on his mental state as to the intended victim." *Id.*

Thus, for Petitioner to be guilty of attempted murder under California law the jury must have

concluded, beyond a reasonable doubt, Petitioner intended to kill each of the three juveniles

present besides Adrian, who was actually shot and killed.  Petitioner's allegation that the jury

was instructed that it could find Petitioner guilty of attempted murder without finding such an

intent is unconvincing.

In pertinent part, the jury was instructed: "In order to convict the defendant of the

attempted murder of Gustavo Teran, Isael Teran, or Alberto [sic] Blanco, the People must prove

that the defendant not only intended to kill Adrian Cortez, but also either intended to kill Gustavo

Teran, Isael Teran and Alberto [sic] Blanco or intended to kill anyone within the 'kill zone.'"

This instruction made clear to the jury that an intent to kill only Adrian alone was not enough to

convict Petitioner on the attempted murder of the other three.  The jury would need to conclude

that Petitioner either intended to kill each of the other three juveniles or intended to kill everyone

within the kill zone, which under the facts of this case constituted Adrian and his three

companions.  Contrary to Petitioner's belief, the jury was not instructed "that when one shoots at

a person in a group one has the necessary intent for everyone."  Pet'r's Pet. at 11.  Indeed, the

jury was instructed that "[i]f you have a reasonable doubt whether the defendant intended to kill

Gustavo Teran, Isael Teran or Albert Blanco, or intended to kill Adrian Cortez by harming

everyone in the 'kill zone,' then you must find the defendant not guilty of the attempted murder

of Gustavo Teran, Isael Teran or Alberto [sic] Blanco."  That is, if the jury found Petitioner

intended to kill only Adrian, but not the others nearby, they must return a verdict of not guilty on

the attempted murder counts.  The Court of Appeal reached a reasonable conclusion when it

determined there was no error in the attempted murder jury instruction.

Furthermore, the Court of Appeal was reasonable in its determination that even if the jury

instruction did result in error, the error was harmless. *See Brecht*, 507 U.S. at 637.  Petitioner's

statement to the police contained ample evidence that he had the specific intent to kill all four of

the rival gang members.  Petitioner said that his statement to "kill em" or "shoot em" was not specific to Adrian and that he meant for David to kill Adrian and his friends.  Petitioner wanted to kill "any Norteno."  *See* Claim III, *supra*.

b.  First Degree Murder

In ruling on Petitioner's claim regarding the first degree murder instruction, and the additional instructions given by the judge in response to jury questions with regard to it, the Court of Appeal found as follows:

> Defendant contends the trial court erred when it addressed the jury's questions regarding the terms "consequences" and "deliberately" in CALCRIM No. 521, an instruction that assists the jury in deciding whether first degree murder was committed. We are not persuaded.

> The court instructed with CALCRIM No. 521 as follows: "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately and with premeditation. [¶] The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before committing the act that caused death. [¶] The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. [¶] A decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated. [¶] On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection. The length of time alone is not determinative."

> During deliberations, the jury asked the court: "When the instructions talk about a consequence, do they mean a legal consequence or do they mean a consequence like somebody possibly getting hurt or killed or something like that?" The court replied that it would depend on the context in which the jury was talking about the term "consequence." Juror No. 3 said the question was in the context of describing the "three elements" of murder, which the court assumed was a reference to CALCRIM No. 521. The court explained that it referred to "factual consequences. In other words, what's going to happen if this trigger is pulled, that sort of thing."

> Sometime later, the jury submitted the following question:

33

"Regarding 1st degree murder, we need different words describing the definition of 'deliberately' or expanded definitions or examples specifically of these parts of the definition: [¶] 'carefully weighed' [¶] 'consequences'-again what exactly could be a 'fact' [¶] 'decided to kill'-does this include decided to kill or cause great bodily injury[?][¶] If possible-use different words to explain the definition of deliberately.'"

Over defense counsel's objection, the trial court further explained the concept for the jury, using language from *People v. Cordero* (1989) 216 Cal.App.3d 275 at page 281 (hereafter *Cordero*) as follows: "Homicides occur in diverse factual settings and the thought processes invoked by assailants are varied. In many instances, an assailant will contemplate consequences to both the victim and to his or her own future. In other cases, the deliberation will simply involve consequences to a third party or even an idea or strongly held principle. [¶] When a slayer chooses killing over another course of action, the results occasioned by that course of action can be enumerable. [¶] The slayer need not have in mind all or any particular type of consequence. He may reflect on several consequences, but it is not a requirement that there be reflection about more than one consequence. [¶] A finding of deliberation may be based on any one consequence."

The court also instructed the jury with CALJIC No. 8.20, which states in pertinent part: "The word deliberate means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. [¶] The word premeditated means considered beforehand. [¶] If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon preexisting reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree. [¶] ... [¶] To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice. And, having in mind the consequences, he decides to and does kill."

The jury then asked: "A finding of deliberation may be based on any one consequence. If only one consequence is determined, must that be a finding of deliberate?" The court explained: "[Y]ou can't find deliberate unless you find a consequence, but just because you find a consequence doesn't mean you are required to say it is deliberation."

When the jury continued to seek guidance, the court suggested the jury review the written instructions. Thereafter, the jury convicted defendant of first degree murder and attempted murder with premeditation and deliberation.

Characterizing the trial court's additional instructions as indicating "any sort of consequence of pulling the trigger would suffice," defendant argues: "This is not the meaning of the instruction for the 'consequence' is not one from simply pulling the trigger, rather it is 'those flowing from the act of killing.' Anyone with an intent to kill has contemplated the consequence of his act of pulling the trigger, i.e., he will cause death. The fact which *Cordero* really states is to be contemplated is some event flowing from the death, something beyond the death itself." In defendant's view, the additional instructions were confusing and "incorrectly suggested merely any consequence of pulling the trigger was all that was required" "rather than the consequence that would flow from that killing."

*Cordero* does not require, nor does any other legal authority require, that to act deliberately in committing murder by shooting, the perpetrator must contemplate every consequence to both the victim and to the perpetrator's future if the decision to kill is made. It suffices if the actor weighs considerations for and against a choice to kill and decides to kill, knowing the decision will result in consequences that include the victim's death. Viewing as a whole the instructions and the court's responses to the jury's inquires (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016), reasonable jurors would understand the concept of deliberation means defendant must have considered the consequences of killing the victim, not merely the consequences of pulling the trigger. There was no error.

Slip Op. at 16-18.

Petitioner argues that the court's responses to the jury's questions on premeditation permitted "a bare intent to kill(or cause great bodily injury) to suffice for first degree murder." Pet'r's Pet. at 11. A careful review of the jury instructions, in their entirety, leads to the opposite conclusion. In the original instructions to the jury, they were told: "The defendant acted deliberately if he *carefully weighed* the considerations for and against his choice and, knowing the consequences, decided to kill." (emphasis added). The jury did not understand the meaning of the term "consequences," and the trial judge attempted to explain the definition to them and read a portion of a published California Court of Appeal decision, *People v. Cordero*, 216 Cal. App. 3d 275, 281, 264 Cal. Rptr. 774 (1989), defining the meaning of the term "consequences" as it relates to premeditation. *See* Rep.'s Tr. at 1188, 1194-95. None of this, however, had any

effect upon the rest of the premeditation instruction.  While the term "consequence" was more carefully defined for the jury, they were still informed that to find deliberation Petitioner must have "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action," *id.* at 1195, and "to constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice," *id.*  When the trial judge attempted to clarify the jury instructions to the jury he did nothing to lower the prosecution's burden of proof or permit the jury to find first degree murder without a showing of premeditation and deliberation.

Additionally, the trial judge never insinuated, as Petitioner argues, that the jury could find Petitioner guilty of first degree murder if they found only an intent to cause great bodily injury, rather than an intent to kill.  When the jury asked whether "decided to kill" "include[s] decided to kill or cause great bodily injury," the court responded by reading to the jury a first degree murder instruction that was very similar in form to the original instruction: "If you find that the killing was preceded and accompanied by a clear, deliberate intent on the party of the defendant *to kill*, which was the result of deliberation and premeditation, so that it must have been formed upon preexisting reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree." *Id.* at 1195 (emphasis added).  The jury found this additional information helpful. *See id.* at 1196.  Viewing the instructions as a whole, they conveyed to the jury that they must find Petitioner had the intent to kill, and the intent to cause great bodily injury was insufficient for a conviction on first degree murder.   The Court of Appeal's determination that the instructions and the trial judge's response to jury questions did not amount to error is reasonable and, as such, Petitioner is not entitled to relief on this claim.

5.  Claim V

In Petitioner's last claim for relief, Claim V, Petitioner argues that as a fourteen-year-old at the time of the underlying offenses his sentence of fifty years to life plus three additional consecutive indeterminate life sentences amounts to cruel and unusual punishment.  Respondent

36

argues that this Claim is procedurally barred in light of the reasoning of the California Court of

Appeal's decision on direct appeal.  However, in the interests of judicial economy, and because

this claim was also addressed on the merits by the Court of Appeal and is clearly without merit

for the reasons described *infra*, the procedural default argument will not be addressed.  In ruling

on Petitioner's claim that his sentence violated both the California and federal Constitutions, the

Court of Appeal determined as follows:

> Defendant argues that his sentence of 50 years to life, plus three
> consecutive indeterminate life terms, constitutes cruel and unusual
> punishment in violation of the California and federal Constitutions.
>
> Defendant forfeited this claim by failing to raise it at the time of
> sentencing. (*People v. Norman* (2003) 109 Cal.App.4th 221, 229;
> *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27.) In any event, even
> if he had properly preserved the issue, the claim would fail.
>
> A punishment violates the California Constitution "if, although not
> cruel or unusual in its method, it is so disproportionate to the crime
> for which it is inflicted that it shocks the conscience and offends
> fundamental notions of human dignity." (*In re Lynch* (1972) 8
> Cal.3d 410, 424.) In applying this principle, we look to (1) the
> nature of the offense and the offender, (2) a comparison with the
> penalty for more serious crimes in the same jurisdiction, and (3) a
> comparison with the punishment imposed for the same offense in
> different jurisdictions. (*Id.* at pp. 425-427.)
>
> Defendant addresses only the first factor, the nature of the offense
> and the offender, emphasizing that he was barely 14 years old at
> the time of the crimes and that he had no prior criminal
> history.FN1 He argues that his sentence is disproportionate because
> he was only an aider and abettor but he will be in prison longer
> than the actual shooter.FN2
>
>> FN1. Defendant makes no effort to compare his
>> sentence with more serious offenses in California or
>> with punishments in other states for the same
>> offense, which we take as a concession that his
>> sentence withstands a constitutional challenge on
>> either basis. (*People v. Crooks* (1997) 55
>> Cal.App.4th 797, 808 [defendant bears burden of
>> establishing disproportionality].) He merely
>> intimates that his sentence is disproportionate in
>> comparison to other states because only 15 states
>> allowed direct filing in criminal court against a
>> minor that is 14. But defendant does not provide us
>> with any analysis of how other jurisdictions punish

similar youthful defendants. Since defendant has not cited any authority supporting a claim of interjurisdictional disproportionality, we reject any such claim. (*People v. Freeman*, *supra*, 8 Cal.4th at p. 482, fn. 2.)

FN2. The three codefendants all pled guilty to lesser offenses and were sentenced as follows: David, the shooter, was sentenced to 35 years to life; Larry was sentenced to 17 years and 8 months; and Martin Castro was sentenced to 7 years in state prison. Defendant rejected the People's offer of a term of 20 years to life.

In considering the nature of the offense and the offender, we examine not only the offense as defined by the statutes but also the particular facts of defendant's crime. We review his motive, the manner in which he committed the crime, the extent of his involvement in the offense, and the consequences of his acts. We also take into account his culpability in light of age, prior criminality, personal characteristics, and state of mind. (*People v. Crooks*, *supra*, 55 Cal.App.4th at p. 806.)

Here, defendant reacted to the taunts of Adrian, Isael, Gustavo, and Albert by telephoning David and asking him to bring a gun. He chose to respond to mere name-calling with deadly force. He chose to go back outside and physically engage in a fight with the four Nortenos. He chose to urge David to "kill 'em" even though the four young men were armed with only rocks. Defendant fails to appreciate the gravity of his conduct; he may not have pulled the trigger, but he caused 16-year-old Adrian's death. It is fortunate for Isael, Gustavo, and Albert that they, too, were not killed.

Defendant's claim that he was only an aider and abettor and did not actually shoot Adrian minimizes the nature of his conduct. "The Legislature has chosen to severely punish aiders and abettors to crimes by a principal armed with a gun committed in furtherance of the purposes of a criminal street gang. It has done so in recognition of the serious threats posed to the citizens of California by gang members using firearms." (*People v. Gonzales* (2001) 87 Cal.App.4th 1, 19 [rejecting a claim of cruel and unusual punishment in an aiding and abetting case that resulted in a life sentence].)

That defendant had no significant prior criminal record is not determinative. (*People v. Martinez* (1999) 76 Cal.App.4th 489, 497.) Defendant "was a member of a criminal street gang, the primary purpose of which was to commit acts of violence in order to intimidate the community and other gangs. Thus, defendant may not have had formal convictions; however, it is reasonable to infer that he was an active gang member, and personally subscribed to

its criminal purposes." (*People v. Villegas* (2001) 92 Cal.App.4th 1217, 1230.)

As for defendant's complaint that David received a lesser sentence, 35 years to life, this is the nature of plea bargains. The prosecution is relieved of its burden of proving guilt and, in return, the criminal defendant is allowed to plead to a lesser offense or to receive a shorter sentence. Defendant rejected an offer of 20 years and was convicted of premeditated first degree murder in which a principal used a firearm to inflict death, and of three counts of attempted premeditated murder on behalf of a criminal street gang. Although defendant hints the resulting sentence was a vindictive response to his rejection of the plea bargain, such a conclusion is baseless. The trial court's discretion was severely limited; it sentenced him in accordance with statutorily prescribed terms. (§§ 186.22, subd. (b)(5), 190, subd. (a), 664, subd. (a); 12022.53, subds. (d) & (e).)

"The choice of fitting and proper penalty is not an exact science but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will. In some cases, leeway for experimentation may be permissible. Thus, the judiciary should not interfere in the process unless a statute prescribes a penalty '"out of all proportion to the offense.' [Citation.]" (*People v. Cooper* (1996) 43 Cal.App.4th 815, 827, quoting *In re Lynch*, *supra*, 8 Cal.3d at pp. 423-424.) Here, the statutory punishment is not grossly disproportionate in light of the nature of the offense and the nature of the offender.

In sum, the sentence does not shock the conscience and is not disproportionate under California law.

Defendant fares no better under federal law. The Eighth Amendment to the United States Constitution, which forbids cruel and unusual punishments, "'does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime.'" (*Ewing v. California* (2003) 538 U.S. 11, 23 [155 L.Ed.2d 108, 119], quoting conc. opn. of Kennedy, J. in *Harmelin v. Michigan* (1991) 501 U.S. 957, 1001 [115 L.Ed.2d 836, 869].) "[T]he gross disproportionality principle [is] applicable only in the 'exceedingly rare' and 'extreme' case. [Citations.]" (*Lockyer v. Andrade* (2003) 538 U.S. 63, 73 [155 L.Ed.2d 144, 156].)

As discussed in connection with the California constitutional claim, defendant's sentence is not grossly disproportionate to the crime. (*See, e.g., Harmelin v. Michigan*, *supra*, 501 U.S. 957 [115 L.Ed.2d 836] [upholding sentence of life without the possibility of parole for possession of a large amount of drugs by a first-time felon]; *Rummel v. Estelle* (1980) 445 U.S. 263 [63 L.Ed.2d 382], [upholding a life sentence for a recidivist thief].) Therefore, his

1        Eighth Amendment claim fails.

2   Slip Op. at 20-21.

3        Petitioner's claim is governed by the relevant Supreme Court authority clearly established

4   at the time the relevant state court decision became final.  *Williams*, 529 U.S. at 390; *see*

5   *Yarborough v. Alvarado*, 541 U.S. 652, 661 (2004).  The decision of the California Court of

6   Appeal in this case became final in 2008, before the Supreme Court's decision in *Graham v.*

7   *Florida*, 560 U.S. __, 130 S.Ct. 2011, 175 L.Ed 825 (2010), which "settled on an authoritative

8   answer to how reviewing courts should apply the [Eighth Amendment's] proportionality

9   principle to non-capital cases."  *Norris v. Morgan*, 622 F.3d 1276, 1287 n. 12 (9th Cir. 2010).

10  Therefore, Petitioner's claim is governed by pre-*Graham* principles as set forth in *Ewing v.*

11  *California*, 538 U.S. 11 (2003), and *Lockyer v. Andrade*, 538 U.S. 63 (2003).  *See Norris*, 622

12  F.3d at 1287.

13       The Eight Amendment provides that "[e]xcessive bail shall not be required, nor excessive

14  fines be imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  The

15  last clause "prohibits not only barbaric punishments," *Solem v. Helm*, 463 U.S. 277, 284 (1983),

16  but any "extreme sentence[ ] that [is] 'grossly disproportionate to the crime.'"  *Ewing*, 538 U.S.

17  at 23 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring in part

18  and concurring in the judgment)).  Prior to *Graham*, there was "no agreement on the proper

19  approach to proportionality review."  *Norris*, 622 F.3d at 1286 (citations omitted).  And,

20  therefore, "the only relevant clearly established law amenable to the 'contrary to' or

21  'unreasonable application of' [AEDPA] framework is the gross disproportionality principle, the

22  precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme

23  case.'"  *Andrade*, 538 U.S. at 73 (citations omitted).

24       This is not that exceedingly rare and extreme case.  Under normal circumstances, a

25  sentence of life imprisonment for the crimes of first degree murder and attempted murder would

26  not raise an eyebrow.  Indeed, life in prison is a common sentence for those found guilty of first

40

degree murder.  *See, e.g.*, Cal. Penal Code § 190 (25 years to life lowest possible sentence for first degree murder); Mich. Comp. Laws 750.316 (life in prison for first degree murder); Wyo. Stat. Ann. § 6-2-101 (same).  What makes this case different is Petitioner's young age, fourteen at the time of the underlying offenses.

The Supreme Court has had more than one occasion to discuss the outer limits on the punishment of juveniles.  *See Thompson v. Oklahoma*, 487 U.S. 815 (1988); *Roper v. Simmons*, 543 U.S. 551 (2005); *Graham*, 130 S.Ct. 2011.  In *Thompson v. Oklahoma*, a plurality of the Supreme Court found that sentencing a juvenile less than sixteen years old to death violated the Eighth Amendment because "such a young person is not capable of acting with the degree of culpability that can justify the ultimate penalty."  487 U.S. at 823 (footnote omitted).  Seventeen years later, in 2005, the Court expanded this reasoning to include all minors, those who are less than eighteen years of age.  *Roper*, 543 U.S. at 574 *abrogating Stanford v. Kentucky*, 492 U.S. 361 (1989) ("The logic of *Thompson* extends to those who are under 18. . . .  It is, we conclude, the age at which the line for death eligibility ought to rest.").  In a case decided two years after the California Court of Appeal reached its determination on Petitioner's appeal, and therefore not part of the clearly established law available to the appellate court, *see Williams*, 529 U.S. at 412, the Supreme Court determined that sentencing juveniles to life in prison without the possibility of parole for crimes other than murder violated the Eighth Amendment.  *Graham*, 130 S.Ct. at 2030.

These cases, taken together, show that the Supreme Court has determined that applying the death penalty to juveniles, or sentencing them to life in prison without the possibility of parole for crimes other than murder, is impermissible.  They also tend to show, however, that there is no clearly established federal law, as determined by the Supreme Court of the United States, which would prohibit sentencing a juvenile to life in prison for murder.  In *Romer*, the Supreme Court did not find fault with the Missouri Supreme Court's decision to resentence the juvenile to life in prison without the possibility of parole.  543 U.S. at 560.  Indeed, in dicta the

Court tacitly accepted that life in prison was an appropriate punishment: "To the extent the juvenile death penalty might have residual deterrent effect, it is worth noting that the punishment of life imprisonment without the possibility of parole is itself a severe sanction, in particular for a young person." *Id.* at 572.  In *Harris v. Wright*, 93 F.3d 581 (9th Cir. 1996), the Ninth Circuit explicitly upheld the sentence of life in prison without the possibility of parole for a fifteen-year-old who had been found guilty of first degree murder.  *Id.* at 585 ("there's no evidence of a consensus against mandatory life without parole for fifteen-year-olds, and we don't subject life imprisonment without parole to the same searching scrutiny we apply to capital punishment" (citing *Harmelin*, 501 U.S. at 944-45)).  The Ninth Circuit relied on the Supreme Court's reasoning in *Harmelin* that a mandatory sentence of life in prison without the possibility of parole was distinguishable from a death sentence and did not warrant special Eighth Amendment scrutiny.  *Harmelin*, 501 U.S. at 995-96 ("We have drawn the line of required individualized sentencing at capital cases, and see no basis for extending it further."); *Harris*, 93 F.3d at 585 ("[W]hile capital punishment is unique and must be treated specially, mandatory life imprisonment without parole is, for young and old alike, only an outlying point on the continuum of prison sentences." (citation omitted)).  While the Supreme Court has since decided that life imprisonment without the possibility of parole for a minor does warrant special attention in circumstances other than murder convictions, *see Graham*, 130 S.Ct. at 2027, the Court has yet to squarely address the issue of sentencing a minor to life in prison upon a conviction for murder. Indeed, in *Graham*, the Court did not rule out the punishment Petitioner received in this case, a life sentence with the possibility of parole, for juvenile nonhomicide offenders.  *See id.* at 2030 ("[W]hile the Eight Amendment forbids a State from imposing a life without parole sentence on a juvenile nonhomicide offender, it does not require the State to release that offender during his natural life.  Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives.").  As such, the California Court of Appeal reached a reasonable conclusion when it determined Petitioner's

1  sentence of fifty years to life in prison plus three additional indeterminate life sentences does not

2  violate the Eight Amendment's proscription of cruel and unusual punishment.  Petitioner is not

3  entitled to relief on this claim.

4  IV.  CONCLUSION

5  For the reasons discussed in this Order, Petitioner is not entitled to federal habeas relief.

6  Should petitioner wish to appeal the court's decision, a certificate of appealability must issue.  28

7  U.S.C. § 2253(c)(1).  A certificate of appealability may issue where "the applicant has made a

8  substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The

9  certificate of appealability must "indicate which specific issue or issues satisfy" the requirement.

10  28 U.S.C. § 2253(c)(3).

11  A certificate of appealability should be granted for any issue that petitioner can

12  demonstrate is "'debatable among jurists of reason,'" could be resolved differently by a different

13  court, or is "'adequate to deserve encouragement to proceed further.'"  *Jennings v. Woodford*, 290

14  F.3d 1006, 1010 (9th Cir. 2002) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)).[4]  In this

15  case, however, Petitioner failed to make a substantial showing of the denial of a constitutional

16  right with respect to any issue presented.

17  Accordingly, IT IS HEREBY ORDERED that:

18  1.    Petitioner's Petition for writ of habeas corpus is DENIED;

19  2.    A certificate of appealability shall not issue; and

20  3.    The Clerk is directed to close this case.

21  / / /

22  / / /

23  / / /

24

25

26  [4]  Except for the requirement that appealable issues be specifically identified, the standard for issuance of a certificate of appealability is the same as the standard that applied to issuance of a certificate of probable cause.  *See Jennings*, 290 F.3d at 1010.

1

2 DATED:  June 17, 2011

3

4

5

6
_____
7 TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26